THOMAS N. LANGAN, Appellee, *vs.* MILK'S GROVE SPECIAL DRAINAGE DISTRICT NO. 1 *et al.* Appellants.

*Opinion filed April 23, 1909.*

1. DRAINAGE—*duty of commissioners to provide ample outlets is mandatory.* The provisions of the Farm Drainage act requiring drainage commissioners to provide outlets of ample capacity for the waters of the district are mandatory, and the commissioners may be compelled by *mandamus,* in a proper case, to perform their duty in that respect.

2. PLEADING—*petition to compel commissioners to deepen ditch need not furnish complete specifications.* A petition for *mandamus* to compel drainage commissioners to deepen and widen the main outlets of the district need not set forth the exact character and amount of work necessary nor furnish plans and specifications for the work, and it is sufficient if it clearly shows the general character of the proposed work and its approximate cost and that the work is necessary and entirely practicable.

3. SAME—*when averments as to demand are sufficient.* A petition for *mandamus* to compel drainage commissioners to widen and deepen the main outlets of the district, which alleges that the petitioner has often requested the commissioners to perform such duty, is sufficient with respect to its averment of a demand.

4. SAME—*when the Statute of Limitations must be specially pleaded.* A *mandamus* proceeding to compel drainage commissioners to deepen and widen outlets is an action at law and the defense of the Statute of Limitations must be specially pleaded, so that the petitioner may set up in reply any special matter which prevents the bar of the statute from attaching.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Iroquois county; the Hon. FRANK L. HOOPER, Judge, presiding.

Appellee filed a petition in the circuit court of Iroquois· county praying a peremptory writ of *mandamus* to compel the commissioners of Milk's Grove Special Drainage District No. 1 to alter, repair and modify the drainage system of said district and to deepen and widen the main ditch; also to deepen and widen two lateral ditches that run across appellee's land and empty into the main ditch at the south line of his land so as to furnish an outlet of ample capacity to carry the water off of appellee's land and to drain the same, so that it would receive the protection and benefit contemplated when the district was organized and the land classified and assessed to pay the cost of the improvement. Appellants demurred generally and specially to the petition. The court overruled the demurrer, and appellants electing to abide by it, a judgment was entered awarding the writ. From that judgment appellants prosecuted an appeal to the Appellate Court for the Second District. That court affirmed the judgment of the circuit court except as to the order for execution, and appellants have prosecuted this appeal to this court.

The substance of the material averments of the petition, as stated by the Appellate Court, is as follows:

"The petition stated that the district was organized on February 26, 1885, under the Farm Drainage act of 1879, for the purpose of constructing, repairing and maintaining

drains, embankments and grades within said district for agricultural and sanitary purposes, by special assessment upon the property benefited thereby. An exhibit attached to the petition and made a part thereof contained a plat of the district and gave the classification of each forty-acre tract therein. The petition stated that the petitioner owned section 35, in township 29, north, and of range 10, east of the third principal meridian, at about the center of said drainage district. From the plat.it appears that he owned nearly one-twelfth of the lands of the district. The petition stated that the district adopted a system of drainage and built one drain extending from the south end of the petitioner's land through the lower part of the district and to an outlet in Langham creek, at the south-eastern part of the district, and constructed laterals emptying into said main ditch, and among them two lateral open ditches crossing petitioner's land from higher land. The petition showed that assessments had been made against the petitioner for over one-sixth of the entire cost of the work done, and that all said assessments were paid when due, besides several later assessments in repairing and maintaining the drainage system. The petition stated that the whole of said section 35 is level land and that the central portion of it is low; that the purpose of said assessments was to furnish petitioner an outlet into which he might drain the waters off of his land and to carry off the waters brought upon his land by said two lateral ditches crossing his land from other land above. The petition stated that said main ditch was not so constructed as to furnish an outlet for the water on petitioner's land and for the waters brought upon his land by said lateral ditches; that the waters brought upon his land by said lateral ditches came from lands the surface of which is higher than petitioner's land; that, owing to the narrowness and shallowness of the main ditch from the south part of petitioner's land to said creek, the waters brought upon petitioner's land by said two lateral ditches remain upon petitioner's land for

such a length of time as to destroy petitioner's crops and grain grown on said lands to the amount of several thousand dollars each year; that this is caused by the narrowness, shallowness and incapacity of said main ditch running from the south part of said petitioner's land to said creek; that said main ditch from petitioner's land to the creek, by reason of error in the construction of the same, completely fails to furnish an outlet for drainage of petitioner's land and for carrying off the water brought upon said petitioner's land by said two lateral ditches and completely fails to furnish an outlet for the drainage of petitioner's land, as was originally contemplated by the construction of said drainage ditch, and that it is of little or no value to the petitioner for any purpose. The petition also alleged that said two lateral ditches were constructed too narrow and too shallow through petitioner's land to carry off from petitioner's land and into the main ditch the water which the said two lateral ditches brought upon said land from lands above. The petition stated that if the main ditch was deepened and widened from a point where it crosses the east line of Milk's Grove township up to a point where the said two lateral ditches connect with the main ditch in the south part of petitioner's land, (which would be, apparently, about the upper one-third of the length of the main ditch,) and if said two lateral ditches were deepened and widened from the place where they emptied into the main ditch up through petitioner's land to his west line, a complete outlet would be furnished, as petitioner is informed and believes, to the drainage of petitioner's land and for carrying off the water brought upon his land by said two lateral ditches. The petition further stated that at the time it was filed, from the point where the two lateral ditches connect with the main ditch to where the main ditch intersects the east line of Milk's Grove township, being about 10,700 feet in distance, there is a fall of about eight feet in the bottom of the ditch, and that said ditch could be deepened and widened suffi-

ciently to give petitioner a complete outlet and carry off the water from petitioner's land and the waters of said two lateral ditches without interfering with the flow in the main ditch, and that an average fall of one foot for said distance would be amply sufficient to carry off said water. The petition further stated that if the main ditch was so deepened and widened as to furnish a complete outlet, as aforesaid, there. would be an average fall in the bottom of said two lateral ditches of at least three feet, while an average fall of one foot would be sufficient. The petition further stated that in 1905 the district deepened and widened one of said lateral ditches so as to cause more water to be brought upon petitioner's land and to increase the already overtaxed capacity of the main ditch, commencing at the south part of petitioner's land, and to cause more water to be brought in to stand on petitioner's land. The petition further stated that the cost of modifying and changing the main ditch from the east line of Milk's Grove township and deepening and widening it to where the two lateral ditches connect with it in the south part of petitioner's farm, being a distance of about 10,700 feet, and deepening and widening the two lateral ditches from the place where the same empty into the main ditch in the south part of petitioner's land up to the point where they intersect the west line of petitioner's land, being a distance of about 2000 feet, would be approximately $8000. The petition further stated that the benefits accruing to the several tracts of land in said district, except petitioner's land, far exceed the several assessments levied against the same; that there is no money in the treasury of the district; that it will be necessary to make an additional levy to raise the amount necessary to modify the drainage system so as to drain the land of petitioner and to carry off the water brought upon petitioner's land by said two lateral ditches, as contemplated in the organization of said district and the classification of said lands; that the benefits accruing to the several tracts of land in the district

will far exceed the amount of the assessments made in completing the district, including the necessary change; that the petitioner has often requested the drainage commissioners and their predecessors in office to deepen and widen said main ditch from the east line of Milk's Grove township up to and into the south part of petitioner's land, and to deepen and widen said two lateral ditches from where the same empty into the main ditch in the south part of petitioner's land up to where they intersect the west line of petitioner's land, so that he might have an outlet to drain his land and to carry off the water brought thereon by said two lateral ditches and might receive the benefits contemplated by the organization of said district and construction of said drainage ditch, but they have refused and neglected so to do."

A. F. GOODYEAR, for appellants.

T. W. SHIELDS, and FRANK J. BURNS, for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

Appellants contend that the trial court erred in overruling the demurrer (1) because the petition does not contain sufficient allegations to entitle appellee to the writ; (2) because the action is barred by the five years Statute of Limitations; (3) because it appears from the face of the petition that appellee has been guilty of *laches* in beginning the suit and said petition contains no allegations explaining the delay; (4) because there is no sufficient allegation of a demand. It is also insisted that the judgment is indefinite and uncertain. The principal contention, and the one to which appellants' brief and argument are chiefly devoted, is, that the petition is indefinite and uncertain; that the drainage commissioners have a discretion in the performance of their duties, and that in such cases *mandamus* will not lie.

The duties and responsibilities of the drainage commissioners are defined in and controlled by the provisions of

the Farm Drainage act of 1885. The appellant drainage district was organized under the law as it existed at the time of its organization, in February, 1885. In that year the legislature passed an act declared to be "an amendatory revision and consolidation" of prior acts relating to the subject of farm drainage and repealing all former acts upon that subject. The act of 1885 did not take effect until July 1 of that year, but it contained the following provision (Laws of 1885, sec. 78, p. 107) : "All drainage districts heretofore organized under any one or more of the acts hereby repealed shall be held, and they are hereby declared to be legally organized, and the assessments made therein shall be held to be legally made. This act, as well as the acts repealed, shall be liberally construed to promote drainage, and the reclaiming of wet and overflowed lands, and in the making and collection of assessments and taxes therefor. The officers, under the repealed act, and proceedings begun, shall be continued under this act, and shall have and possess all the rights, powers and privileges the same and to the same extent as though the whole proceedings were commenced and carried on under the provisions of this act, and only affected as to the future as herein provided."

Section 17 of the Farm Drainage act provides that "upon the organization of a drainage district, the commissioners shall go upon the land and determine upon a system of drainage, which shall provide main outlets of ample capacity for the waters of the district, having in view the future contingencies, as well as the present." (Hurd's Stat. 1908, p. 847.) Section 41 of the act provides: "After the completion of the work the commissioners shall thereafter keep the same in repair, and if they find by reason of error in locating or constructing the ditches, or any of them, or from any other causes the lands of the district are not drained or protected as contemplated, or some of them receive partial or no benefit, they shall use the corporate funds of the district to carry out the original purpose to the end that all

the lands, so far as practicable, shall receive their proper and equal benefits as contemplated when the lands were classified." If sufficient funds are not on hand for that purpose, authority is conferred by the same section upon the commissioners to make a new levy.

In *Peotone Drainage District* v. *Adams,* 163 Ill. 428, we held the provisions of the statute requiring drainage commissioners to provide outlets of ample capacity for the waters of the district were mandatory. Discussing the two sections of the statute referred to, we said, on page 430: "Where the land owners in the district have been assessed and taxed for the purpose of constructing drains or ditches of sufficient depth and capacity to drain their lands, they have a right to insist that the commissioners shall do what the statute says they shall do,—that is, determine upon or adopt a system of drainage which shall provide main outlets of ample capacity for the waters of the district. If a system or plan of drainage is adopted which will not afford outlets of sufficient capacity to drain the lands of the district the land owner will derive no benefit whatever from the taxation imposed upon him. This was never contemplated by the legislature. * * * Under the section of the statute *supra,* (sec. 41,) where an error has been committed, can the drainage commissioners shield themselves behind what they term a discretionary power and thus leave the land owner without any remedy whatever? If they can, the law ought to be repealed at once, in order to prevent others from being imposed upon by its unjust provisions. But we think the statute gives a negative answer to the inquiry. The statute nowhere says that a discretion exists where a wrong has been committed on one of the land owners, but, on the other hand, it says they shall use the corporate funds of the district to carry out the original purpose, to the end that all lands shall receive their proper benefits as contemplated when the lands were classified. Under these two sections of the statute we do not think any discretion is vested

in the commissioners, but, on the other hand, the duty enjoined is imperative. It may be conceded that the drainage commissioners have a discretion in regard to the location of the drain and in regard to many of the details of the work, but this fact does not change the duty resting on the commissioners to provide sufficient outlets for the waters in the district."

The allegations of the petition could not have been more certain and definite unless appellee had employed a civil engineer and caused a survey, plats and profiles to be made showing the exact increase in width and depth necessary to be made in order to provide outlets of ample capacity. This he was not obliged to do. The averments of the petition as to the lay of the land, the fall, and the cost of the work, showed it to be entirely practicable to so enlarge and deepen the ditches as to make their capacity ample to carry the waters of the district. The demurrer admitted these allegations to be true. The statute makes it the duty of the drainage commissioners to provide these outlets, and confers upon them power to determine the work necessary to be done for that purpose and to tax the lands benefited to pay for it. The law did not require of the appellee that he should at his own expense ascertain and inform the commissioners of the exact character and amount of work necessary to be done in order to give the ditches sufficient capacity to carry the waters, and furnish them plans and details for the work. The duty to provide such ditches is mandatory upon the commissioners, and ample power is conferred upon them by the statute for the performance of this duty. The petition in this case was as definite and certain as the petition in *Kreiling* v. *Nortrup,* 215 Ill. 195. The petition in that case was not demurred to but was treated as sufficient and the relief prayed awarded.

With reference to the Statute of Limitations, it is only necessary to say that this is an action at law and is governed by the rules of pleading applicable to other actions at

law. (*Cleary* v. *Hoobler,* 207 Ill. 97; *Mayor of Roodhouse* v. *Briggs,* 194 id. 435; *Chicago Great Western Railway Co.* v. *People,* 179 id. 441.) In such actions the Statute of Limitations cannot be availed of by demurrer but must be specially pleaded, so that the plaintiff may reply any special matter which prevents the bar attaching. *Gunton* v. *Hughes,* 181 Ill. 132; *Wall* v. *Chesapeake and Ohio Railroad Co.* 200 id. 66.

It is also to be noted that the petition avers that one of the lateral ditches across appellee's land had been enlarged in 1905, thereby increasing the flow of water from the lands above, to and upon his land, and, because of lack of capacity of the main ditch to carry it off, the increased flow of water was caused to stand upon petitioner's land. In addition to that allegation, the petition avers that the petitioner has often requested the drainage commissioners and their predecessors in office to deepen and widen said ditches so as to afford outlets of ample capacity, and we think there is no merit in the defense of *laches.*

Appellants contend that the averment that petitioner requested the drainage commissioners to deepen and enlarge the ditches is not a sufficient averment of a demand. We think otherwise. The averment of demand in the petition in *Kreiling* v. *Nortrup, supra,* was in identically the same language as the averment of demand in this case and it was treated as sufficient. From the answer filed in *Peotone Drainage District* v. *Adams, supra,* it would seem the allegation of demand in that case was the same as in this.

There is no merit in the claim that the judgment of the circuit court is uncertain and not sufficiently specific. It commands appellants to deepen and widen the ditches so as to provide an outlet of ample capacity to carry the waters off the appellee's land. The allegations of the petition, admitted to be true by the demurrer, show this is entirely practicable, and it is precisely the duty imposed upon the commissioners by the statute. Under decisions above cited

we have held the performance of this duty may be compelled by *mandamus,* and we have also held that the commissioners are personally liable for intentional neglect to perform such duty. *Binder* v. *Langhorst,* 234 Ill. 583; Farm Drainage act, sec. 46.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*